IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CARLOS MIRANDA-CORTEZ,<br>EDUARDO MIRANDA-CORTEZ,<br><br>Defendants. | MEMORANDUM DECISION<br>AND ORDER<br><br>Case No.  2:11-cr-0580-CW<br><br>Judge Clark Waddoups |

## INTRODUCTION

Before the court are two motions to suppress: the first by Defendant Carlos Miranda-Cortez ("Carlos") [Dkt. No. 33], and the second by Defendant Eduardo Miranda-Cortez ("Eduardo") [Dkt. No. 25].  For the reasons stated below, Defendants' motions to suppress as to the evidence obtained in the basement apartment are GRANTED.  The court also requests further briefing from the parties regarding the impact this suppression has on the admissibility of other evidence.

## FACTUAL BACKGROUND[1]

On May 19, 2011, eight to ten members of the Utah County Major Crimes Task Force ("UCMCTF") met to discuss a "knock-and-talk" operation focused on Defendants' residences, following surveillance of a controlled drug-buy and what were believed to be other drug-related activities.  At least seven officers took part in the operation, including Officer Jarid Barney,

---

[1]    The court notes that many facts in this case are contested.  As such, the court will only focus on those relevant facts needed to issue this opinion.  Because other additional facts may become important in the future in ruling on the suppression of the remaining evidence, the court reserves its finding of those facts for a later date.

Sargent B. J. Robison, Officer Kyle Shelly, Officer Scott Spieth, Officer Orlando Ruiz, as well as ICE Agents Carlos Gamarra and Marshall Mathis. Later this same day, a group of these individuals approached the front door of the house with the plan of using an illegal alien investigation as a pretext for gaining access to the home to further investigate the drug allegations. Because of conflicting testimony, the court cannot determine exactly which officers approached the house. As the officers came close to the house, Carlos and Roseli Valenzuela appeared at the entryway. The officers asked the couple about their familiarity with an illegal alien, but they responded that they did not know the person. The officers asked who lived in the downstairs portion of the house. Carlos responded that it was his brother Eduardo. The officers asked if they could speak with Eduardo and Carlos then took them around the house to the downstairs apartment. Carlos called for Eduardo, who opened the door outwards and spoke to the officers. The court cannot conclude from the facts presented that the officers asked for permission to enter Eduardo's home or that Eduardo consented to their entry. Nevertheless, the officers entered the home. The officers testified that after they entered the basement apartment, they asked Eduardo if they could do a "safety sweep" to assure that no one else was in the apartment. They assert that Eduardo again assented and that during this sweep they then found methamphetamine on a table. The officers have testified that the evidence was not touched before the police-photos were taken; the actual photos, however, do not corroborate this testimony. Using the drugs as grounds for probable cause, the officers then obtained a warrant. With the warrant obtained, additional drugs were found in the upstairs house, leading to the arrest of Defendants.

## ANALYSIS

### I. Consent For the Officers to Enter the Basement Apartment

The Fourth Amendment of the United States Constitutions states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Supreme Court has further instructed that a review of the reasonableness of a warrantless search "begins . . . with the basic rule that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (U.S. 2009) (citations omitted). Indeed, the constitutional presumption is that the police will obtain a warrant before conducting a search and that an exception will truly be an exception, not the routine exercise of supposedly "good police work."

"Voluntary consent to search is one such exception." *United States v. Harrison*, 639 F.3d 1273 (10th Cir. 2011); *see also, United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir. 1999) ("Because a consensual encounter is voluntary, such an encounter does not constitute a "seizure" within the meaning of the Fourth Amendment."). "The government bears the burden of proving that consent is given freely and voluntarily." *Harrison*, 639 F.3d at 1278 (further stating, "[w]e emphasize that it is not the defendant's burden to prove that he was, in fact, coerced. Instead, the government bears the burden of showing that the defendant was not coerced"). Thus, when the evidence is equally conflicting as to which party is the most credible, the burden of proof favors the defendant. *See United States v. Romero*, 24 Fed. Appx. 955, 960 (10th Cir. Sep. 11, 2007)

("The government bears the burden of proving, by a preponderance of the evidence, that unequivocal and specific consent was obtained."). In this case, notwithstanding the government's argument that they had probable cause, the officers proceeded without a warrant. Thus, if the search is to be upheld, the government has the burden of proving that Eduardo gave free and voluntary consent to Officer Spieth for the officers to enter his home.[2]

### A. The Clarity of the Consent to Enter

In order for the government to prove consent was given, the Tenth Circuit has required "clear and positive testimony [to prove] that consent was unequivocal and specific." *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007). Generally, this "clear and positive testimony" occurs in the context of a defendant who gave uncontroverted consent, but argues that such consent was either forced or coerced. *See Id.* at 790 (examining the case of a defendant who conceded that his affirmative gesture was meant to let the officer know that he could search his car, but argued that the consent was given under duress). This case differs in that the consent is not conceded. Accordingly, the first question before the court is whether the testimony of Officer Spieth was "clear and positive." The court finds that it was not.

After the initial knock-and-talk upstairs, Carlos and Officers Spieth and Ruiz went to the back of the house to the basement apartment where the door was accessible only through a descending stairway. Of the two officers, only Officer Spieth spoke Spanish. Officer Spieth testified that upon arriving at the basement apartment, Carlos knocked on the door and called out

---

[2] The issue before the court is whether Eduardo gave consent, not whether consent was free and voluntary. Accordingly, the court need not undergo a full analysis of the "totality of the circumstances." *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (U.S. 1973) ("[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."). That said, even if consent to enter were given, the evidence suggests that Eduardo may have acceded to what he understood as an order. The officers' deception and pretext, the multiple officers in the tight stairwell, Defendants' testimony that one of the officers pulled the door open, and the fact that Officer Ruiz wanted to do a sweep of the kitchen with a flashlight rather than simply turning on the light, all tend toward a showing that the officers were intent upon entering the apartment and justifying the search by arguing they had consent.

to the occupants inside. [Tr. 84.] At first there was no answer. Carlos then tried the door knob, but the door was locked. Carlos again knocked on the door and called out to the occupants. A short time later, a male voice answered from inside. Eduardo opened the door. Officer Spieth testified that he asked Eduardo, in Spanish, "if I could step in and speak with him inside of the residence." [Tr. 84.] Officer Spieth denied, in response to leading questions, that he threatened, intimidated or cajoled. [Tr. 85.] Officer Spieth further testified that Eduardo "was very accommodating . . . and told [Officer Spieth] that [he] was welcome to come inside." Officer Spieth did not testify to the exact words he or Eduardo used or to an English translation of those words. Rather, Officer Spieth testified that, "[Eduardo] was very accommodating, just like Mr. Carlos Miranda-Cortez had been. He told me that I was welcome to come inside. He stepped back, opened the door, and invited me in." [Tr. 85.] He further testified that Eduardo responded to his question about coming in by verbally saying "Yes. He said yes." [Tr. 85.] He further stated that Eduardo's body language suggested an invitation to enter, "[b]y him stepping back and opening the door fully and then providing room for us to enter through the doorway." [Tr. 85.]

The problem with this testimony, however, is that there is a significant difference between an occupant expressly telling an officer that "[the officer] was welcome to come inside . . . and invit[ing him] in," and the occupant responding "yes" to an officer's statement that may have been understood as a command. The first forecloses the possibility of equivocal consent. The second welcomes uncertainty. This is not to say that Officer Spieth's testimony is necessarily inconsistent. Rather, the problem is that his testimony speaks to the periphery of the consent by way of a general summary of what occurred. Without more specificity, the court is

still unsure of exactly what was said and how Eduardo's consent was verbally communicated. Accordingly, Officer Spieth's testimony regarding the consent is not clear.

### B. The Credibility of the Officers' Testimony of the Consent

Even assuming Officer Spieth's testimony were clear evidence of Eduardo's consent, the court must weigh the credibility of that testimony. In doing so, it is important to first note that the officers completely controlled the circumstances under which they elected to proceed. The officers argue that they had probable cause to obtain a search warrant, but after almost constant surveillance of the house for almost two weeks, they elected to proceed without one. The officers also acknowledge that the "knock-and-talk" was a pretext to obtain this consent. [Tr. 15.] Indeed, the officers went to the home after advance planning and briefing, not to seek additional information, but to gain entrance and thereby find drugs.[3] [Tr. 15, 45-46.] This knock-and-talk included the use of ICE agents and photos of persons the officers had no reason to believe were at that time living at the residence. In addition, the officers knew the residents spoke Spanish, but chose to proceed to the basement with only one officer who could serve as a witness to the consent they were seeking. As already indicated, the entire exchange in the basement took place in Spanish, in the presence of Officer Spieth and Ruiz. Only Officer Spieth, however, understood Spanish. Furthermore, the officers proceeded without a recording device or written consent forms, although it is clear that both a recording device and consent forms were available because they were later used after the officers had gained entrance to the home. [Tr. 104, 136, 413.]

As previously explained, Officer Spieth explained that Eduardo gave the officers consent to enter through verbal and nonverbal communications. In contrast to Officer Spieth's

---

[3] Although pretext and deception may be constitutionally permissible in some circumstances, the fact that the officers acknowledge that pretext and deception was a planned course of action bears heavily upon the reliability of their testimonial conclusions that consent was freely given.

6

testimony, the only other Spanish-speakers present, Carlos and Eduardo, gave very different accounts of the events at the basement door. Carlos testified that Eduardo only opened the door a little and that it was Officer Ruiz who opened it further. [Tr. 316.] Carlos further testified that after showing a picture of an individual, the officers stated that they had to verify that the person wasn't there. [Tr. 317-18.] But at no time did Officer Spieth ask for consent to go into the living room. [Tr. 321.] Eduardo corroborates his brother's account, although he testified that it was Officer Spieth who opened the door and not Officer Ruiz. [Tr. 378, 380.] Eduardo further testified that when he heard the knocking on the door, he told them to wait while he put on his pants. [Tr. 277.] Eduardo and his wife had prepared for bed. [Tr. 392]. The lights were off and he was in the apartment alone with his wife. When the officers entered the apartment, she was sitting on the bed. [Tr. 88]. This testimony, along with the fact that Eduardo knew that there were drugs on the table, weighs against the finding that Eduardo would voluntarily welcome the officers into his home.

At oral argument, the government dismissed Defendants' testimony, asserting that they are "admitted liars." True or not, the assertion underscores the government's fundamental misunderstanding of the burden in this case. Indeed, it does not matter whether the Defendants' testimony is credible if the government otherwise fails to bear its burden to prove that Eduardo gave consent. *See Harrison*, 639 F.3d at 1278. And despite the whole operation being conceived by the officers, the government's only evidence of consent is the limited testimony of Officer Spieth. Therefore, the government's argument must necessarily rise and fall on the credibility of that testimony. In weighing the credibility of this testimony and in determining whether the government has met its burden, the court notes three areas of particular concern.

1.   *The Knock-and-Talk Participants*

First, the testimony about who approached the house for the initial knock-and-talk is inconsistent. Officer Barney explained that the officers "only had two [of them] go to the door so we didn't overwhelm them." [Tr. 18.] He identified these officers as Agent Gamarra and Officer Spieth. [Tr. 16.] Officer Ruiz corroborated that testimony, saying he was hiding around the corner of the building. [Tr. 143.] Officer Spieth testified that he and Agent Gamarra approached the door, but upon further questioning he said that he was not completely certain that Officer Ruiz was not also with him. [Tr. 100-01.] In any event, Officer Spieth stated that it was not possible that anyone else was with him at the door, such as ICE Agent Mathis. [Tr. 101.] Yet, Agent Gamarra testified that it was he, Agent Mathis, and Officers Spieth and Ruiz that approached – although he later stated that it was possible that Officer Ruiz did not actually accompany the group to the door. [Tr. 186 - 87.] And, Agent Mathis similarly testified that it was he and Agent Gamarra who approached the front door, with Officers Spieth and Ruiz "both behind me." [Tr. 258-59.] These inconsistencies raise questions about the general trustworthiness of the officers' testimony. With so many differing accounts, the court is unable to determine who was actually at the door during the knock and talk. This lack of agreement on obvious and important details weighs against the reliability of the officers' recollections.

2.   *The Consent to Enter Eduardo's Apartment*

The second problem with Officer Spieth's testimony about whether Eduardo gave consent to the officers to come into the basement apartment is that it is inconsistent with the proven physical layout of the entrance. Officer Spieth testified that Eduard's invitation occurred "[b]y him stepping back and opening the door fully and then providing room for [Officers Spieth and Ruiz] to enter through the doorway." [Tr. 85.] Indeed, Officer Spieth agreed with the

8

characterization that Eduardo gestured the officers in by "stepping back and fully opening the door." [Tr. 115.] He repeated this testimony, confirming in response to the court's questioning that Eduardo pulled the door towards himself, into the hallway, to allow the officers to enter. [Tr. 170-171.] It was later proven, however, that this factual scenario was impossible because the physical layout of the apartment required that the door must have actually opened outward. [Tr. 116.] This means that to fully open, the door was either pulled open by the officers, as the Defendants contend, or pushed open by Eduardo. In any event, Officer Spieth's testimony that Eduardo gave him consent to enter because Eduard stepped back and fully opened the door is simply not possible. Clearly, this "gesture" did not take place as Officer Spieth recalled. And, because Officer Spieth was incorrect in this important testimony, there is considerable doubt about the reliability of his conclusion that Eduardo freely consented to the officers entering the apartment.

            3.     *The Evidence of the Drugs Found in the Basement*

In addition to the other problems already discussed, the officers' testimony about how they found the drugs is inconsistent with the evidence taken by the officers at the scene and at the time the drugs were found. The officers testified that after they entered the basement apartment, they asked Eduardo if they could do a "safety sweep" to assure that no one else was in the apartment. They assert that Eduardo also assented to this sweep. [Tr. 89.] Eduardo denies that the officers asked and that he gave consent. The lights were off in the kitchen, and either Officer Ruiz or Spieth entered the kitchen with a flash light looking for other people. [Tr. 403, 409.] The officers do not claim to have turned on the kitchen lights. Officer Ruiz stated that "[o]n the kitchen table by itself it was clear there was a plastic bag on the kitchen table which was filled with a white crystal substance." [Tr. 150, 159.] Officer Spieth similarly stated in his report that

9

the bag was in open view and not covered or concealed in anyway. [Tr. 124-25.] Both statements are inconsistent with the objective evidence collected at the scene. It is evident from the photos taken at the time that the drugs were, in fact, behind a TV towards the back corner of the table with a number of other items around the drugs, including paper towels, food and other knick-knacks. [Tr. 160], (Gov.'s Ex. 6). Accordingly, a sweep of the room with a flash light intended to reveal the presence of a person seems unlikely to have so readily found the drugs unless drugs were the focus of the search.

More problematic is the fact that Officers Spieth and Ruiz both testified that nothing was done to manipulate the scene before the photos were taken. [Tr. 122-23, 150.] The placement of objects in the different photos raises serious questions about the accuracy of the adamant testimony that nothing was moved before the photos were taken. Three photos call the officers' testimony into doubt: (1) a wide-shot picture of the table (Defs.' Ex. 5); (2) a digital zoom of that same picture (Gov.'s Ex. 6); and (3) a second photo taken at a closer, but different angle. (Defs.' Ex. 6.) There are a number of anomalies in comparing the two angles. First, the zip-lock seal of the baggie can only be seen in Defendants' Exhibit 6. Second, there is question of whether the Santa Claus jar or the spoon was moved. Third, the glove appears to have been moved because the tip of the glove on the second finger from the right in Government's Exhibit 6 appears to be resting squarely on a grout line, where it is not in Defendants' Exhibit 6. And fourth, there is doubt that the paper towel is in the same position in each of the photos because the calendar, which is under the television, appears to be covered in one picture but not in another. Indeed, Officer Spieth admitted that at some point during the time the pictures were being taken, the towel was moved and that the paper towel was underneath the drugs. [Tr. 127.]

The government tried to refute this admission by eliciting testimony through leading questions that these inconsistencies are all due to a change in the angle of the photos. [Tr. 247-48.) It is true that the photos lack the clarity one would hope for to resolve the issues in dispute. In the end, however, the problems with the evidence are too numerous to ignore. Eduardo was in the apartment alone with his wife, prepared for bed, the lights were off at least in the kitchen, he was slow coming to the door, and, according to the officers, he had illegal drugs lying openly on the table. There was no reason to voluntarily let the officers in. Furthermore, only one officer was in a position to testify about whether consent was given and he did nothing to provide an objective record from which consent could be confirmed. Indeed, his version of what happened is unclear and is otherwise contradicted by the only other witnesses that understood the conversation, as well as the evidence at the scene. In addition, the inconsistent photos and the officers' admission that evidence was moved raise further doubts about the reliability of the officers' testimony.

Because of these inconsistencies and the government's failure to acknowledge or otherwise convincingly explain them, the court concludes that the testimony of the officers involved in this operation is not sufficient to sustain the government's burden to prove it had freely obtained consent to search the basement apartment. The court wants to be clear that it is not impugning the testimony of the officers. Nothing before the court suggests that the officers have intentionally attempted to mislead the court or give knowingly false testimony. Indeed, it is more likely that the officers were distracted by their roles in continuing their deception to gain access to the house and were so overly concentrated on finding the drugs once they entered the basement, that they failed to appreciate all the details of what was occurring.

The officers may well have concluded that they had sufficient evidence to proceed without a warrant. Uncertainty, however, must weigh in favor of the constitutional protections. A pretext pursued with the stated objective of gaining entrance without a warrant may prematurely lead officers to believe they have succeeded in obtaining sufficient concessions from the home occupant to claim it was consent. With no exigencies evident here to justify a departure from the constitutional requirement, the officers rely on the consent exception, which is cluttered with uncertainties and contradictions.

These weaknesses have derailed the government from meeting its burden of proving voluntary consent. Indeed, the court cannot find by a preponderance of the evidence that Eduardo freely and voluntarily gave his consent. Finally, even were the court were to accept that consent was freely given, the likelihood that the evidence may have been tampered with is sufficient grounds to suppress the evidence found in Eduardo's apartment. Therefore, Defendants' motion to suppress the evidence in the basement apartment is GRANTED.

## II. The Warranted Search Upstairs

With the basement drugs suppressed, there remains a question of the validity of the warrant and the admissibility of the statements and evidence of drugs found upstairs. Although Carlos argues that such evidence should be suppressed "as a fruit thereof" in his moving papers [Dkt. No. 33], he fails to make the argument in his memoranda in support of his motion to suppress. [Dkt. No. 66.] Because this is a question of great constitutional importance, the court requests that Defendants submit a brief on this issue on or before May 3, 2012. Of particular interest to the court is whether Roseli provided her statement to Agent Gamarra before he learned that drugs were discovered in the basement, as contended by the government. [Dkt. No. 72, 26.] The government will then have an opportunity to respond on or before May 22, 2012.

## **CONCLUSION**

     For the reasons stated herein, the government has failed to meet its burden and show that Eduardo gave consent to enter his apartment. Defendant's motion to suppress is GRANTED in part, as to the drugs seized in the basement apartment. The court will stay ruling on Defendants' motions to suppress the additional evidence until supplemental briefing is received.

     DATED this 16th day of April, 2012.

                                          BY THE COURT:

                                          Clark Waddoups
                                          United States District Judge